THE HONORABLE JOHN C. COUGHENOUR

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR16-0056-JCC |
| Plaintiff, | ORDER |
| v. | |
| DANIEL DEREK BROWN, | |
| Defendant. | |

This matter comes before the Court on Defendant Daniel Derek Brown's motion to suppress evidence (Dkt. No. 44) and the Government's response (Dkt. No. 45).[1] Having thoroughly considered the parties' briefing and the relevant record, and the evidentiary hearing held on April 4, 2017, the Court hereby DENIES the motion for the reasons explained herein.

I.  **BACKGROUND**

On January 11, 2016, at approximately 7:20 p.m., the Seattle Police Department (SPD) received a 911 call from Sandra Katowitz. (Dkt. No. 44 at 2; Dkt. No. 45 at 1.) Ms. Katowitz is a staff member at the YWCA in downtown Seattle, and was calling to report that an unidentified resident walked in the door and stated, "That guy has a gun." (Dkt. No. 44 at 2.) The unidentified resident refused to speak with the 911 operator or the police, and refused to give her name. The resident relayed the physical description of the person she claimed had the gun to Ms. Katowitz:

---

[1] The Defendant did not file a reply brief.

a black male with dreadlocks; 20 to 30 years old; wearing a camouflage jacket and red shoes. (*Id.*; Dkt. No. 45 at 2.) The 911 operator asked, "And where did he put the gun? Did you see?" (Dkt. No. 44 at 2.) Ms. Katowitz responded, "I—no." (Dkt. No. 44-1 at 5.) Then the 911 operator asked, "What was he doing with the gun? Handling it? Holding it? Pointing? What?" (*Id.* at 6.) Ms. Katowitz responded, "Uh, she just came in and said he has a gun." (*Id.*)

SPD Officers Breckon and Beecroft responded to the YWCA and spoke with Ms. Katowitz, but not with the anonymous resident. (Dkt. No. 45 at 2; Dkt. No. 44 at 2.) They updated dispatch that "we have no victim of any crime." (Dkt. No. 44 at 2.) Meanwhile, Deputy Mikulcik and Deputy Litsjo, from the King County Sheriff's Office Metro Transit Unit, were patrolling downtown and heard the 911 call. (Dkt. No. 45 at 2.) Deputy Mikulcik responded and saw a male matching the description,[2] who turned out to be Defendant. (*Id.*) Deputy Mikulcik made a U-turn and began following Defendant. (*Id.*) Deputy Mikulcik activated his emergency lights and attempted to contact Defendant. (*Id.* at 3.) At this point, Defendant began to run. (*Id.*; Dkt. No. 44 at 3.) The deputies chased Defendant with their respective patrol cars, cut him off, and then exited their vehicles and ordered Defendant to the ground at gunpoint. (Dkt. No. 44 at 3; Dkt. No. 45 at 3.)

At this point SPD Officers Breckon and Beecroft arrived on the scene. (Dkt. No. 45 at 3.) The deputies handcuffed Defendant and performed a protective weapons sweep, locating a semi-automatic handgun in his waistband. (*Id.*; Dkt. No. 44 at 4.) Deputy Litsjo searched Defendant's jacket and found $162.00 and approximately 8.1 grams of cocaine. (Dkt. No. 44 at 4.) Another deputy searched Defendant's backpack and recovered ammunition, a knife, and an expandable baton. (Dkt. No 44 at 4; Dkt. No. 45 at 4.)

On January 20, 2016, King County Deputy Smith conducted a phone interview of Ms.

---

[2] At the evidentiary hearing, the deputies testified that Defendant was wearing a multicolored jacket and a camouflage backpack. Given the time of night, the multi-colored aspect of the jacket (Dkt. No. 45-7 at 3), and the fact that Defendant admitted at the hearing that he was wearing a camouflage backpack, the Court accepts that Defendant sufficiently matched the description.

Katowitz, who provided the name of the YWCA resident who initially reported that there was a man outside with a gun. (Dkt. No. 45 at 4.)

On March 2, 2016, Defendant was indicted on the following charges: Felon in Possession of a Firearm, Possession of Cocaine Base with Intent to Distribute, and Possession of a Firearm in Furtherance of Drug Trafficking. (Dkt. No. 13.) Defendant now brings this motion to suppress, arguing that the items seized by law enforcement were the fruit of an illegal stop because the investigatory detention was not supported by a reasonable suspicion that criminal activity was afoot. (Dkt. No. 44 at 5.)

## II. DISCUSSION

### A. Legal Standard

"An officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 120 (2000) (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). Reasonable suspicion must exist at the time the officer initiates a *Terry* stop. *See Florida v. J.L.*, 529 U.S. 266, 271 (2000); *United States v. Fouche*, 776 F.2d 1398, 1402 (9th Cir. 1985). In the reasonable suspicion context, a "totality of the circumstances" approach is relevant. *Alabama v. White*, 496 U.S. 325, 328–29 (1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Ultimately, a "reasonable suspicion must be based on common sense judgments and inferences about human behavior." *Wardlow*, 528 U.S. at 125. Here, *White*, *J.L.*, and *Wardlow* inform this Court's totality of the circumstances approach in determining whether reasonable suspicion existed at the time the deputies stopped Defendant.

In *White*, the police received an anonymous tip that a woman in possession of cocaine would leave an apartment building at a specific time, get into a particular car, and drive to a named hotel. 496 U.S. at 327. Standing alone, the anonymous tip did not justify a *Terry* stop. *Id.* at 329. However, police observations verified that the anonymous tipster accurately predicted the woman's movements. *Id.* Although it was a "close call," the corroboration by independent police

work gave the tip moderate indicia of reliability such that by the time officers pulled the defendant over, they had a reasonable suspicion that crime was afoot. *Id.* at 332.

In contrast, the police in *J.L.* received an anonymous call reporting that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." 529 U.S. at 268. Other than the tip, the officers had no reason to suspect the young man of illegal conduct. *Id.* The Supreme Court held that an accurate description of what a person was wearing and where he was standing was reliable only in the sense of identifying the individual; it provided no predictive information through which to test the informant's knowledge or credibility. *Id.* at 271–72. Therefore, the officers had no reasonable suspicion to justify a *Terry* stop and frisk of J.L. *Id.* at 271. That he was indeed carrying a gun was irrelevant to whether the police had a reasonable basis when they stopped him. *Id.*

*Wardlow* addressed *Terry* stops in the context of unprovoked flight from police officers. In *Wardlow*, officers were patrolling a high crime area in order to investigate drug transactions. 528 U.S. at 121. The officers observed the defendant, holding an opaque bag, look in the direction of the officers and flee. *Id.* at 121–22. The officers gave chase, stopped the defendant, and performed a *Terry* frisk, revealing a gun. *Id.* at 122. Although the Supreme Court declined to create a bright line rule that unprovoked flight establishes reasonable suspicion, it nonetheless stated that "[h]eadlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrong doing, but it is certainly suggestive of such." *Id.* at 124. The Court held that in those circumstances, the defendant's flight justified the officers in conducting a *Terry* stop and frisk. *Id.* at 125.

**B.    Analysis**

   **1.    Anonymity of the Tip**

The Government argues that the tip was not anonymous because (1) the 911 caller—Ms. Katowitz—was not anonymous, (2) SPD officers spoke with Ms. Katowitz prior to Defendant being detained, and (3) the anonymous resident who reported the tip to Ms. Katowitz has since

been identified. (Dkt. No. 45 at 6–7.) All of the Government's arguments fail.

First, the fact that the person relaying the anonymous tip was not herself anonymous is irrelevant. Ms. Katowitz did not claim to have seen the man holding a gun. When the 911 operator asked her what the man was doing with the gun, Ms. Katowitz responded, "Uh, she just came in and said he had a gun." (Dkt. No. 44-1 at 5.) Ms. Katowitz did not verify that the man had a gun, she only relayed information from an anonymous source. Laundering an anonymous tip through an identifiable relay does nothing to cure concerns over the tip's reliability.

Second, the officers who did speak to the caller were not the ones who pursued or stopped Defendant, making that argument also irrelevant. Finally, the fact that the anonymous tipster was later identified (in this case nine days later) does not somehow *ex post facto* impart reliability to the tip or make it any less anonymous than when the officers first responded to it. This was an anonymous tip.

### 2. Totality of the Circumstances

The officers who pursued and detained Defendant had two pieces of information on which to determine whether there was reasonable suspicion to conduct a *Terry* stop: (1) an anonymous tip that a black man wearing red shoes and a camouflage jacket was carrying a gun, and (2) Defendant fled as Officer Mikulcik approached. Each one would be insufficient on its own to establish reasonable suspicion. The anonymous tip here is indistinguishable from the one the Supreme Court held unreliable in *J.L.*—a man wearing specific clothing, at a particular location, who was armed. On that alone, the officers did not have reasonable suspicion to justify a *Terry* stop of Defendant.

Similarly, the fact of Defendant's unprovoked flight, in isolation, was also insufficient. The Government claims that in *Wardlow*, the Supreme Court "specifically held that flight, in response to a police presence, is a sufficient basis to detain and investigate an individual." (Dkt. No. 45 at 8.) The Government overstates the holding. Unprovoked flight is a factor to be considered, and it is certainly relevant in a totality of the circumstances analysis. But in

*Wardlow*, the Court declined to adopt a bright line rule and determined that under those facts—of which being in a high crime area was significant—the unprovoked flight provided reasonable suspicion.

This Court, as the Supreme Court did in *Wardlow*, acknowledges that citizens may have many innocent reasons for fleeing upon sight of law enforcement. As Justice Stevens stated regarding Proverbs 28:1 ("The wicked flee when no man pursueth; but the righteous are as bold as a lion"), "I have rejected reliance on [this] proverb in the past, because its ivory-towered analysis of the real world fails to account for the experience of many citizens of this country, particularly those who are minorities." *Wardlow*, 528 U.S. at 129 n.3 (Stevens, J., concurring in part and dissenting in part) (internal quotations omitted). The Government has not pointed to any other facts or circumstances which would raise Defendant's unprovoked flight to behavior so suspicious that a *Terry* stop was justified.

Each event, in isolation, was insufficient to establish reasonable suspicion. However, the Court's inquiry does not end there. Looking at the totality of the circumstances, Deputies Mikulcik and Litsjo had reasonable suspicion to stop Defendant. The fact that the officers received a tip—even though anonymous—that Defendant was wearing a camouflage jacket and red shoes, and carrying a gun, and the deputies spotted a man substantially matching that description, coupled with the fact that Defendant ran as soon as Deputy Mikulcik began driving towards him, established the "minimal level of objective justification" to make the stop. *See Florida v. Bostick*, 501 U.S. 429, 437 (1991). Defendant had every "right to ignore the police and go about his business." *See Florida v. Royer*, 460 U.S. 491, 498 (1983). Had he done so, any *Terry* stop by the police would have been unjustified. Under a totality of the circumstances analysis, however, Deputies Mikulcik and Litsjo had a "reasonable articulable suspicion that criminal activity [was] afoot," and the *Terry* stop and frisk of Defendant was justified. *See Terry*, 352 U.S. at 30.

//

## III. CONCLUSION

For the foregoing reasons, Defendant's motion to suppress evidence (Dkt. No. 44) is DENIED.

DATED this 4th day of April, 2017.

John C. Coughenour
UNITED STATES DISTRICT JUDGE